FILED
7/22/2019
Clerk, U.S. District Court
District of Montana
Helena Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JADA MARIE JOHNSON, and<br>DOMINIQUE AURTHERALLE<br>HAMILTON<br><br>Defendants. | CR-19-4-H-CCL-01<br><br>FINDINGS OF FACT,<br>CONCLUSIONS OF LAW<br>&<br>ORDER |

Before the Court is Defendant Jada Marie Johnson's Motion to Dismiss Indictment. (Doc. 142). The motion came on for hearing on June 18, 2019. Defendant was represented by her counsel, Michael Donahoe, and the United States was represented by Assistant United States Attorney Ryan Weldon. The Court requested post-hearing briefing and Defendant filed her reply brief on June 24, 2019. The Court has considered the parties pre and post hearing briefing and documents filed by the parties and the testimony from the hearing and is prepared to rule on Defendant Johnson's motion to dismiss.

**BACKGROUND**

On May 1, 2019, the grand jury returned a 15-count indictment charging Defendant Johnson and her do-defendant, Dominque Hamilton, with five counts of bank fraud, five counts of wire fraud, and five counts of aggravated identity theft. Both defendants appeared for an arraignment before Magistrate Judge Lynch on May 15, 2019, and were released pending further proceedings in this case. The Court entered a scheduling order on May 16, 2019, setting trial for June 17, 2019. Since that time, Defendant Hamilton has entered into a plea agreement with the United States and entered guilty pleas as to Counts I and XI of the indictment.

Defendant Johnson moves to dismiss the indictment on the grounds that she became a confidential informant for the Missouri River Drug Task Force based on a confidential informant agreement that she understood as an agreement that "her fraud case (the instant case) would remain in state court and that she would likely receive a sentence of probation." (Doc. 15 at 5).

Although Defendant acknowledges that the United States cannot be bound by a cooperation agreement to which the United States Attorney is not a party, she relies on *United States v. Williams*, 780 F.2d 802, 803 (9th Cir. 1986), to argue that "even if the U.S. Attorney was not a party to the cooperation agreement, it would be fundamentally unfair not to enforce it." (Doc. 16 at 2). She argues in the

alternative, relying on *United States v. Flemmi*, 225 F./3d 78, 90 (1st Cir. 2000) that the government should be bound by the agreement because it was ratified by Assistant United States Attorney Weldon. (Doc. 16 at 2).

**LEGAL STANDARD**

Enforcement of a cooperation agreement between the United States and the individual offering to cooperate requires that the person making the promise not to prosecute has the authority to make the promise and that the person to whom the promise is made relies on the promise to her detriment. *Thomas v. INS*, 35 F.3d 1332, 1337 (9th Cir. 1994). The United States Court of Appeals recognized in *Thomas* that a "cooperation agreement is analogous to a plea agreement." *Id*. State officials can no more bind the federal government to the terms of a cooperation agreement than they can bind the federal government to the terms of a plea agreement. *See United States v. Cordova-Perez*, 65 F.3d 1552, 1554 (9th Cir. 1995), *overruled on other grounds as recognized by In re Gallaher*, 548 F.3d 713, 718 n. 7 (9th Cir. 2008). Similarly, law enforcement agents employed by the federal government cannot, as a general rule, bind the United States Attorney to a promise as to whether a prosecution will be initiated in federal court. *Id*.

The United States Court of Appeals has recognized an exception to the

general rule "where, although the United States Attorney was not a party to a cooperation agreement, breach of the agreement render[s] a prosecution fundamentally unfair." *Williams*, 780 F.2d at 803. The Ninth Circuit rejected the defendant's argument that his prosecution was fundamentally unfair in *Williams*, noting that Williams "was not induced by the agreement to incriminate himself, to furnish information useful to the government in developing the case against him, or to plead guilty, nor did he suffer any other prejudice that might render his conviction unfair. *Id*.

"In principle, the government may be bound by an unauthorized agreement if a properly authorized official subsequently ratifies it." *United States v. Flemmi*, 225 F.3d 78 at 90. In the absence of an express ratification, "ratification can be implied only when the ratifying office knows of the agreement, fails to repudiate it in a timely manner, and accepts benefits under it." *Id*.

**FINDINGS OF FACT**[1]

1.  Detective Zapata, of the Helena Police Department, was a credible witness and testified that he spoke with Ms. Johnson on January 16, 2018 about her involvement in the allegedly unlawful use of a debit card that eventually led to the

---

[1] The Court bases the following findings on notes taken by the Court and the court reporter's rough draft from the hearing, as no party has ordered a transcript of the hearing.

federal prosecution in this case.

2. Although Ms. Johnson voluntarily met with Detective Zapata at the law enforcement center, he advised her of her *Miranda* rights and she waived those rights.

3. Detective Zapata informed Ms. Johnson that there was a possibility that the charges relating to her allegedly unlawful use of a debit card could be charged in federal court because her activity crossed state lines.

4. Ms. Johnson asked Detective Zapata if there was a way she could avoid getting charged, claiming that she knew someone else who had avoided charges. Detective Zapata was familiar with the individual she identified and told her that individual was charged. The only promise that Detective Zapata made to Ms. Johnson was that she would be charged.

5. Detective Zapata did not know during his January 16, 2018, meeting with Ms. Johnson that she would be charged with a federal offense.

6. Detective Zapata explained the recording system used during his interview with Ms. Johnson, which could only be shut off using a toggle switch located outside the room. Detective Zapata did not turn off the recording system until he concluded his interview concerning the fraud case and left the room to get Detective Snelling. Detective Zapata was not in the room during Detective

Snelling's conversation with Ms. Johnson.

8. Ms. Johnson testified that she asked Detective Zapata what she could do to get out of trouble, but he refused to answer her question until the recording was shut off. Her statement was contradicted by Detective Zapata's explanation of the recording system, which the Court deems credible. At any rate, the parties appear to agree that Detective Zapata brought Detective Snelling in to speak with Ms. Johnson about becoming a confidential informant and was not present during their conversation, which was not recorded.

9. Detective Zapata was aware that Ms. Johnson signed an agreement to become a confidential informant because he witnessed the agreement.

10. Detective Zapata spoke with Special Agent Sampson of the FBI about the possibility of federal charges on January 18, 2018, which is when he learned that the fraud case against Ms. Johnson would be considered for federal prosecution.

11. Detective Snelling, of the Helena Police Department, was a credible witness and testified that he spoke with Ms. Johnson on January 16, 2018, about the possibility of her becoming a confidential informant for the Missouri River Drug Task Force (MRDTF or Task Force).

12. The Task Force was "founded in 1990 as a multi-agency task force to

address drug-related crimes." (Doc. 37 at 2). Although the Task Force receives some federal funding and federal agents can be assigned to the Task Force, the Task Force operates independently from and is not supervised by the United States Attorney's Office although it can and does present cases to the United States Attorney's Office, just as other law enforcement agencies present cases to the United States Attorney's Office. (Doc. 38-1 at 2).

13. During his January 16, 2018, meeting with Ms. Johnson, Detective Snelling convinced her to fill out and sign the "Missouri River Drug Task Force Confidential Informant Agreement" (CI Agreement).[2]

14. To the extent that anything in the CI agreement can be construed as a promise, it was, at most, a promise that Detective Snelling would make a favorable recommendation regarding a pending prosecution.

15. Detective Snelling testified that he told Ms. Johnson during their initial meeting, on January 16, 2018, that he could make no promises or guarantees and repeated that cautionary statement many times during subsequent meetings.

16. Ms. Johnson signed the CI Agreement without knowing at the time

---

[2] A redacted version of the CI Agreement was filed under seal prior to the hearing and can be found in the record at Doc. 18-2. The document was identified as Exhibit B during the hearing and shown to various witnesses but never formally admitted into evidence.

whether the pending prosecution referenced in the agreement would be in state or federal court.

17. Ms. Johnson is not sure when, if ever, she was told that her cooperation with the Missouri River Drug Task Force on drug cases could guarantee that she would not be prosecuted in federal court on fraud charges. She testified that Detective Zapata never told her that her debit card case would not go to federal court.

18. Ms. Johnson testified that she spoke to Detective Snelling on numerous occasions and she could not remember what was said each time. She testified that Detective Snelling told her more than once that he could not make any promises. She got the idea from Detective Snelling that she could earn her way out of federal prosecution by doing drug buys for the Task Force. She knew that Detective Snelling was communicating with someone from the FBI about her drug buys, and assumed that once her drug buys rose to the level of "federal weight," she would be out of federal trouble.

19. Ms. Johnson testified that she chose to stop cooperating with Detective Snelling at some point because he wanted her to "get another person" but would not tell her anything when she asked what was going on (presumably with her potential fraud case). According to Ms. Johnson, the most explicit statement

Detective Snelling made to her about the pending prosecution was that he was pretty sure that her case would be dropped to a state level.

20. Detective Snelling testified that after Detective Zapata told him that the fraud case against Ms. Johnson might be prosecuted in federal court, he contacted FBI Special Agent Sampson to find out if there was any issue with Ms. Johnson acting as a confidential informant given the possibility of a federal charge against her. Detective Snelling left Special Agent Sampson a voice mail message on January 24, 2018, and she returned his call on January 25, 2018.

21. FBI Special Agent (SA) Sampson was a credible witness and testified about her conversations with Detectives Zapata and Snelling. She also testified about her conversations with Assistant United States Attorney (AUSA) Ryan Weldon.

22. SA Sampson testified that AUSA Weldon told her that the fraud case against Ms. Johnson would be considered for federal prosecution and that she passed that information along to Detective Zapata.

23. SA Sampson testified that after speaking with Detective Snelling on January 25, 2018, she spoke to AUSA Weldon about Ms. Johnson working as a confidential informant for the Task Force. After AUSA Weldon told her to make sure that no promises or guarantees were made to Ms. Johnson, SA Sampson

talked to Detective Snelling again and made it clear that no promises or guarantees should be made to Ms. Johnson.

24.     Richard Goldsberry, an agent with the Department of Homeland Security who is assigned to the Missouri River Drug Task Force, was a credible witness and testified about his conversation with Ms. Johnson in January of 2018. He was at the meeting to provide support for Detective Snelling. Agent Goldsberry knew that Ms. Johnson had signed a written agreement to act as a confidential informant but was not familiar with the terms of the agreement. He told Ms. Johnson that he had seen cases where a prosecution was not pursued federally based on an informant's cooperation, but that he could make no promises.

25.     Ms. Johnson worked as a confidential informant for the Missouri River Drug Task Force from January to August of 2018, and participated in eight controlled buys.

26.     Detective Snelling spoke with Ms. Johnson on January 26, 2018, before she participated in her first controlled buy. He told her that he had spoken to an FBI agent and reiterated that there were no promises or guarantees.

27.     Detective Snelling believes that Ms. Johnson assisted the Task Force

by performing controlled buys and would be willing to recommend to the United States that it recommend that she be considered for a reduced sentence, if she were to be convicted on the charges she is currently facing.

28. Detective Snelling learned that Ms. Johnson was going to be prosecuted in federal court in April of 2019, shortly before the indictment was filed.

**CONCLUSIONS OF LAW**

1. Ms. Johnson knew that she was entitled to have counsel present before she spoke with Detectives Zapata and Snelling on January 16, 2018. She voluntarily waived her right to counsel and agreed to sign the CI agreement without consulting an attorney.

2. None of the law enforcement agents who spoke with Ms. Johnson during the time she was acting as a confidential informant for the Missouri River Drug Task Force had a duty to insist that she consult with an attorney or to provide her with an attorney.

3. None of the law enforcement agents who spoke with Ms. Johnson during the time she was acting as a confidential informant for the Missouri River Drug Task Force promised her that the fraud case against her would not be charged in federal court based on her cooperation in unrelated drug and homicide

investigations.

4. Even if such a promise had been made, it would not be binding on the United States because none of the law enforcement agents who spoke with Ms. Johnson during the time she was acting as a confidential informant for the Missouri River Drug Task Force had the authority to promise that the United States Attorney for the District of Montana would not charge her in federal court for her alleged fraud.

5. Even if there was an agreement between Ms. Johnson and Detective Snelling that her cooperation with the Missouri River Task Force would result in no federal prosecution against her in the fraud case, continued prosecution of Ms. Johnson in this case is not fundamentally unfair because she was not induced by the agreement to incriminate herself in this case or provide evidence that could be used against her in this case.

6. Detective Snelling was not consulted as to whether Ms. Johnson should be prosecuted federally in the case investigated by Detective Zapata and therefore had no opportunity to made a favorable recommendation concerning that prosecution. He is, however, prepared to make a favorable recommendation as to any sentence which may be imposed in this case, should she be convicted.

7. Far from ratifying any alleged agreement made by Detective Snelling,

AUSA Weldon instructed SA Sampson to make sure that there were no promises made to Ms. Johnson; SA Sampson passed that information along to Detective Snelling.

8. Detective Snelling reiterated his position that he could make no promises or guarantees to Ms. Johnson before she participated in her first controlled buy, and before she could suffer any injury in connection with her reliance on whatever she believed at the time she signed the agreement.

**CONCLUSION & ORDER**

Ms. Johnson's belief that she could avoid federal prosecution in her fraud case by cooperating with the Missouri River Drug Task Force in unrelated drug and homicide investigations, while sincere, was not reasonable given the repeated warnings from the members of the Task Force that they could not make promises or guarantees. While this hearing may have been avoided had Detective Snelling recorded his discussion with Ms. Johnson concerning the CI Agreement or insisted that she be represented by counsel, Defendant has presented no authority for the proposition that he was required to do either. Accordingly,

IT IS HEREBY ORDERED that Defendant Johnson's motion to dismiss the indictment (Doc. 15) is DENIED.

IT IS FURTHER ORDERED:

This case is set for trial on August 27, 2019, at 9:30 a.m., in Courtroom II, United States Courthouse, 901 Front Street, Helena, Montana before the undersigned sitting with a jury.

Any plea agreement shall be <u>received</u> in the Clerk's Office at <u>Helena</u> by August 9, 2019, by 3:00 p.m., which means that the plea agreement should be filed simultaneously with a motion to change plea by the deadline, and the original plea agreement submitted to chambers by the due date. Motions for enlargement of time in which to file a plea agreement shall be filed no later than August 9, 2019. In the absence of a motion to extend the plea agreement deadline and except for good cause shown, no plea agreement will be considered by the court thereafter.

Any party seeking a continuance of the trial date shall file a motion to continue on or before August 9, 2019.

In the absence of a signed Plea Agreement or a motion to continue the trial date by August 9, 2019, the Clerk will order a jury on August 12, 2019. Late filing of motions to continue or plea agreements may result in assessment of costs or imposition of other sanctions against the parties and/or counsel.

Proposed voir dire questions, proposed jury instructions, and a verdict form shall be filed with the Clerk of Court in <u>Helena</u> by August 12, 2019.

The parties shall jointly prepare jury instructions upon which they agree

(proposed joint instructions). If necessary, each party may also prepare a set of proposed supplemental instructions if different from agreed joint instructions. **No two instructions shall be submitted with the same number**. The parties shall also prepare an agreed upon verdict form with the instructions. If a verdict form cannot be agreed to, each party shall prepare a separate verdict form together with a written statement explaining why they do not agree on a joint verdict form.

  The Government shall file one working copy of the Joint Proposed Jury Instructions and Joint Proposed Verdict Form; all parties shall file any Supplemental Proposed Jury Instructions and Separate Verdict Form; and all parties shall e-mail all such filed documents and a clean copy of each, in WordPerfect, Word or a compatible program, omitting macros or special coding or formatting other than appropriate citation format, to [ccl_propord@mtd.uscourts.gov.](ccl_propord@mtd.uscourts.gov.)

  The format of Jury Instructions shall be:

1)   The "clean copy" shall contain:

  (A)  a heading reading "Instruction No. ___", and

  (B)  the text of the instruction.

2)   The "working copy" shall contain:

  (A)  a heading reading "Instruction No. __",

(B) the text of the instruction,

(C) the number of the proposed instruction,

(D) the legal authority for the instruction, and

(E) the title of the instruction; i.e., the issue of law addressed by the proposed instruction.

3) Jury instructions shall be prepared in 14-point Times New Roman font.

The United States shall use exhibit numbers 1-499, and defendants shall use 500 and up. If the case has multiple defendants, it shall be defense counsel's responsibility to coordinate with each other as to not duplicate exhibit numbers. In no event shall two or more parties use identical numbers.

The original and two copies of all exhibits to be used at trial are to be bound in loose leaf binders with extended tabs, and submitted to Chambers one week before trial.

The parties shall be prepared to use the Jury Evidence Recording System (JERS). JERS allows jurors to use a touch-screen to see the evidence admitted at trial in the jury room during their deliberations. JERS is NOT designed to present evidence in the courtroom. Counsel are responsible for showing their own exhibits during trial or advising the courtroom deputy of their intended request for the

deputy to display paper exhibits through the Doar system. Detailed information about how to use JERS, including the proper naming convention and form of exhibits, is found on the Court's website, http://www.mtd.uscourts.gov/ under the heading "Attorneys." Parties must submit their exhibits in proper form to the Clerk's office no later than one week before trial.

To aid and assist the court in preparing for trial and in trying the case,

IT IS FURTHER ORDERED that the Government shall submit to the court on or before August 12, 2019, for the exclusive use of the Court, a trial brief and two trial notebooks containing:

(a) a short summary of the nature and substance of the testimony of the witness;

(b) a list of all the exhibits to be used with that witness;

(c) a list containing a description of each exhibit to be used with each witness;

The trial brief shall include legal authority as to the Government's position on all legal issues and evidentiary rulings and any anticipated objections thereto. Counsel for defendant may, but is not required to, submit to the court a similar trial brief from defendant's perspective.

USA vs. Johnson
CR-19-4-H-CCL

To enable the court to operate in the most efficient manner possible, it is essential that this schedule be strictly adhered to by the parties.

Done and dated this 22nd day of July, 2019.

_____
CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE